IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
EASTERN DIVISION

BENJAMIN TILLMAN,               )
                                )
          Plaintiff,            )
                                )
vs.                             )          CV-99-PT-0504-E
                                )
J. L. SIVLEY, ET AL.,           )
                                )
          Defendants.           )

## MEMORANDUM OF OPINION

This is a civil action filed pursuant to 28 U.S.C. § 1331 and *Bivens v. Six Unknown Named Agents of the Federal Bureau of Narcotics*, 403 U.S. 388 (1971) in which the plaintiff, Benjamin Tillman, alleges that his constitutional rights were violated during his incarceration at the Federal Correctional Institution in Talladega, Alabama. The plaintiff is presently incarcerated at the Beaumont United States Penitentiary in Beaumont, Texas. The *pro se* complaint was filed on March 3, 1999. Plaintiff names as defendants J. L. Sivley,[1] Warden, Lieutenant Hynek,[2] H. E. Williamson, Senior Officer Specialist, R. Hardin, Senior Officer Specialist, P. Gore, Senior Officer Specialist, J. Powell, Senior Officer Specialist, and Physician's Assistant Mourtada. Plaintiff seeks monetary damages.

On September 11, 2001, the court entered an Order for Special Report directing that copies of the complaint in this action be forwarded to each of the named defendants and requesting that they

---

[1] The court notes that defendant Warden J. L. Sivley is deceased. He was killed in an automobile accident in August of 1999 (Special Report page one).

[2] It is noted that plaintiff incorrectly identified defendant Hynek in his complaint as Lieutenant Hyenk.

*36*

file a special report responding to the factual allegations of the complaint. Plaintiff subsequently notified the court that defendant Mourtada should have been listed as a defendant in the Order for Special Report, but was not. Because it is well-settled that in order to protect a *pro se* prisoner's right of access to the courts, their complaints are read by less stringent standards than formal pleadings drafted by lawyers, the court allowed plaintiff to add P. A. Mourtada as a defendant in this action and entered a second Order for Special Report directing that a copy of the complaint in this action be forwarded to defendant Mourtada and requesting that he file a special report responding to the factual allegations of the complaint.  On February 22, 2002, the defendants filed their special report attaching relevant documents, the declarations of defendants Howard Williamson, Reese Hardin, Lora Hynek, Paul Gore, Jeffrey Powell, and Mounir Mourtada, and the declarations of Lieutenant Darren Testerman, Disciplinary Hearing Officer Jeffrey Bryan, and Dr. Gene M. Roffers, Clinical Consultant to the Medical Director. By Order of September 12, 2002, the parties were notified that the special report filed by the defendants would be construed as a motion for summary judgment, and the plaintiff was notified of the provisions and consequences of Rule 56 of the *Federal Rules of Civil Procedure*. Plaintiff failed to file a response to the defendants' motion for summary judgment.

## SUMMARY JUDGMENT STANDARD

In considering a motion for summary judgment, the court must determine whether the moving party is entitled to judgment as a matter of law.  Summary judgment may be granted only if there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law. FED. R. CIV. P. 56. In making that assessment, the court must view the evidence in a light most

favorable to the non-moving party and must draw all reasonable inferences against the moving party. *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986). The burden of proof is upon the moving party to establish his prima facie entitlement to summary judgment by showing the absence of genuine issues and that he is due to prevail as a matter of law. *See Clark v. Coats & Clark, Inc.*, 929 F.2d 604 (11th Cir. 1991). Once that initial burden has been carried, however, the non-moving party may not merely rest upon his pleading, but must come forward with evidence supporting each essential element of his claim. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); *Barfield v. Brierton*, 883 F.2d 923 (11th Cir. 1989). Unless the plaintiff, who carries the ultimate burden of proving his action, is able to show some evidence with respect to each element of his claim, all other issues of fact become immaterial and the moving party is entitled to judgment as a matter of law. *See Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Bennett v. Parker*, 898 F.2d 1530 (11th Cir. 1990), *cert. denied*, 498 U.S. 1103 (1991). As the Eleventh Circuit has explained:

> Facts in dispute cease to be "material" facts when the plaintiff fails to establish a prima facie case. "In such a situation, there can be 'no genuine issue as to any material fact,' since a complete failure of proof concerning an essential element of the non-moving party's case necessarily renders all other facts immaterial." Thus, under such circumstances, the public official is entitled to judgment as a matter of law, because the plaintiff has failed to carry the burden of proof. This rule facilitates the dismissal of factually unsupported claims prior to trial.

*Bennett v. Parker*, 898 F.2d at 1532 (citation omitted).

FACTS

Applying these standards to the evidence before the court, the following facts appear to be undisputed or, if disputed, have been taken in a light most favorable to the plaintiff. On February 23, 1998, plaintiff was housed in cell C-6 (plaintiff's complaint page three and defendant Williamson's declaration page two). Defendants Williamson and Hardin approached plaintiff's cell and told him that he was getting a new cell mate (plaintiff's complaint page three). Plaintiff replied in the affirmative and at approximately 9:55 p.m., defendants Williamson and Hardin handcuffed him from behind so that the other inmate could be placed into the cell (plaintiff's complaint page three, defendant Williamson's declaration page two, and defendant Hardin's declaration page two). Plaintiff then became irate and stated that he did not want a cell mate (defendant Williamson's declaration page two and defendant Hardin's declaration page two). At this point, plaintiff did not state that he was afraid of the other inmate or that they had had any problems in the past (defendant Williamson's declaration page two and defendant Hardin's declaration page two). After plaintiff had seen the inmate who was to be his new cell mate, inmate Waseko Register Number 28846-120, he told the officers that he and inmate Waseko had gotten into a verbal altercation at the United States Penitentiary in Atlanta, Georgia (hereinafter USP Atlanta) (plaintiff's complaint page three). After plaintiff had informed defendants Williamson and Hardin of the altercation, they contacted defendant Hynek by radio and informed her of the situation (plaintiff's complaint page three). Defendant Hynek instructed defendants Williamson and Hardin to place the other inmate into the cell with plaintiff anyway (plaintiff's complaint page three). Defendants Williamson and Hardin told plaintiff that it was defendant Hynek's decision and that it was out of their hands (plaintiff's complaint page three). Plaintiff informed defendants Williamson and Hardin several times that he feared for his life if he

4

were housed with the other inmate (plaintiff's complaint page three). Plaintiff was informed that he had no choice (plaintiff's complaint page three). The cell door was secured and the handcuffs were removed from the other inmate (defendant Williamson's declaration page two and defendant Hardin's declaration page two). When defendants Williamson and Hardin instructed plaintiff to come to the cell door so that his handcuffs could be removed, plaintiff stated that "[h]e wasn't uncuffing, because his life was in danger" (plaintiff's complaint pages three and attached page marked 3A). Plaintiff refused the defendants' order that he come to the cell door to have the handcuffs removed and stated that he was keeping the handcuffs (defendant Williamson's declaration page two and defendant Hardin's declaration page two). The other inmate was then re-cuffed (defendant Williamson's declaration page two and defendant Hardin's declaration page two). The other inmate was instructed to sit on the bed and he did so (defendant Williamson's declaration page two and defendant Hardin's declaration page two). After the other inmate had been handcuffed, defendants Williamson and Hardin entered the cell and tried to force plaintiff's hands into the food slot so that they could remove the handcuffs (plaintiff's complaint attached page marked 3A). Defendant Williamson secured plaintiff by holding the handcuffs with his left hand and defendant Hardin stood at the side of plaintiff guiding him as they backed plaintiff out of the cell (defendant Williamson's declaration page two and defendant Hardin's declaration page two). When plaintiff got to the toilet area, he stopped moving, then twisted his body in an apparent attempt to jerk away from defendant Williamson (defendant Williamson's declaration page two and defendant Hardin's declaration page two). Plaintiff pulled away from the door and stated that he wanted to talk with defendant Hynek (plaintiff's complaint attached page marked 3A). When plaintiff jerked or pulled away, defendant Williamson's left ring finger became caught between the cuffs causing excruciating

pain (defendant Williamson's declaration page two). Defendant Hardin observed defendant Williamson struggling because his finger was caught in the handcuffs (defendant Hardin's declaration page two). Plaintiff continued twisting and trying to jerk free while defendant Williamson was unable to free his finger (defendant Williamson's declaration page two). Defendants Williamson and Hardin grabbed plaintiff, threw him against the wall on his jaw, twisted his right arm up, and threw him onto the floor (plaintiff's complaint attached page marked 3A). Defendant Hardin pushed plaintiff toward a mattress on the floor with his right hand on plaintiff's shoulder (defendant Williamson's declaration page two and defendant Hardin's declaration page two). Defendants Williamson and Hardin then put their feet on plaintiff's face (plaintiff's complaint attached page marked 3A). Once plaintiff was down on the mattress on the floor, defendant Williamson was able to release his hand from the handcuffs (defendant Williamson's declaration page two and defendant Hardin's declaration page two). Defendant Hardin pinned plaintiff to the mattress with both hands on his shoulders while defendant Williamson pushed his body alarm (defendant Williamson's declaration page two and defendant Hardin's declaration page two). Defendant Hardin instructed plaintiff to remain still and calm (defendant Hardin's declaration page two). Defendant Williamson then contacted defendant Hynek by radio and requested that she report to the Special Housing Unit Alpha B (defendant Williamson's declaration page two and defendant Hardin's declaration page two). At approximately 10:05 p.m., defendant Hynek, while on duty as Operations Lieutenant, received a request from the Special Housing Unit Number One Officer, defendant Williamson, to report to Unit Alpha B (defendant Hynek's declaration page two).While waiting for defendant Hynek to arrive, defendant Hardin kept plaintiff pinned to the mattress. Plaintiff did not try to get up, but kept saying "You guys shouldn't have done this" (defendant

6

Williamson's declaration page two and defendant Hardin's declaration page two). On February 23, 1998, at approximately 10:05 p.m., defendants Gore and Powell were picking up count slips in the housing units when defendant Powell heard defendant Williamson in Alpha-B unit request the Shift Lieutenant to come to his location (defendant Powell's declaration page two). Defendant Mourtada was in his office when he heard a body alarm in the Special Housing Unit (defendant Mourtada's declaration page one). Defendant Mourtada ran to the unit and ended up following defendant Hynek (defendant Mourtada's declaration page one). Upon hearing the request from the Alpha-B Officer in Charge for defendant Hynek to report to the Special Housing Unit, Officer Testerman also responded with defendant Hynek and reported to Alpha-B, cell C-06 (Officer Testerman's declaration page one). Defendant Gore responded to Alpha-B unit in response to a call for assistance (defendant Gore's declaration page two). When defendant Gore arrived at the unit, defendant Hynek was directing staff to cell C-6 (defendant Gore's declaration page two).  Upon reporting to the unit with Acting Lieutenant Darren Testerman, and defendants Powell, Gore, and Mourtada, defendant Hynek reported to cell C-6 (defendant Hynek's declaration page two). When defendant Gore arrived at the cell, he observed plaintiff stating to defendants Hardin and Williamson "You better have your paperwork right, you can't do this" (defendant Gore's declaration page two). Upon his arrival, defendant Powell observed defendant Hardin in cell C-6 with plaintiff pinned on a mattress on the floor (defendant Powell's declaration page two). Upon arrival, Officer Testerman observed plaintiff face down on a mattress on the floor with defendant Hardin holding the restraints  (Officer Testerman's declaration page one). Another inmate was seated on the bed with his hands secured behind his back (Officer Testerman's declaration page one). Defendant Hynek observed plaintiff lying face down on a mattress on the floor with his hands restrained behind his back in handcuffs

7

(defendant Hynek's declaration page two). Defendant Hardin had plaintiff pinned to the mattress with his hand on plaintiff's back between the shoulder blades (defendant Hynek's declaration page two). Another inmate was seated on the bed in the cell (defendant Hynek's declaration page two). When defendant Hynek arrived, defendant Williamson reported that plaintiff had become upset when he was instructed to accept the other inmate as a cell mate and had subsequently refused to back up to the cell door to let the officers remove the handcuffs (defendant Hynek's declaration page two). Defendant Williamson reported that as the officers were backing plaintiff out of the cell, he attempted to jerk free of the handcuffs. Defendant Hardin grabbed plaintiff by the arm and pushed him down to the mattress on the floor where he pinned plaintiff, freeing defendant Williamson to contact defendant Hynek (defendant Hynek's declaration page two). Upon his arrival, defendant Mourtada saw plaintiff on top of a mattress on the floor in handcuffs (defendant Mourtada's declaration page one). Defendant Mourtada also saw defendant Hardin holding plaintiff down on the mattress by his arms (defendant Mourtada's declaration page one). Defendant Hynek instructed the officers to escort plaintiff to cell A-2 (defendant Williamson's declaration page three, defendant Hardin's declaration page two, defendant Hynek's declaration page two, defendant Gore's declaration page two, defendant Powell's declaration page two, and Officer Testerman's declaration page two). Defendant Hynek asked defendant Mourtada to go to the other cell to help secure the other inmate until additional staff arrived (defendant Mourtada's declaration pages one and two). Defendant Mourtada went to the other cell and stayed with the inmate until officers came to relieve him (defendant Mourtada's declaration page two). Plaintiff was escorted to cell A-2 by defendants Gore, Powell, and Hardin without incident (defendant Williamson's declaration page three, defendant Hardin's declaration page three, defendant Hynek's declaration page two, defendant

8

Gore's declaration page two, and defendant Powell's declaration page two). While the defendants were escorting plaintiff to cell A-2, he began yelling "I'm a soldier, Y'all can't do anything to me. You should have put me in four-points" (defendant Powell's declaration page two).  Plaintiff was seated on a mattress inside the new cell (defendant Williamson's declaration page three, defendant Hardin's declaration page two, and defendant Hynek's declaration page two). Defendant Mourtada went to plaintiff's cell to evaluate him (defendant Mourtada's declaration page two). Defendant Mourtada examined him and told plaintiff to put water on his face (plaintiff's complaint attached page marked 3A). Defendant Gore heard plaintiff state again "You can't do this, get your paperwork ready" (defendant Gore's declaration page two). Defendant Gore also heard plaintiff state to defendant Hynek "Put me down, this ain't nothing, put me down, I'm tough" (defendant Gore's declaration page two). After defendant Mourtada examined plaintiff, he asked him if he had any injuries and plaintiff replied in the negative (defendant Powell's declaration page two and defendant Mourtada's declaration page two). Defendant Mourtada also asked plaintiff if he needed any medication and plaintiff responded "No" and that he was "Fine" (defendant Mourtada's declaration page two). Defendant Mourtada performed a visual and manual check on plaintiff and noted no injuries (defendant Mourtada's declaration page two). The restraints were properly placed (defendant Mourtada's declaration page two). After defendant Mourtada stated that plaintiff had no injuries, the defendants exited the cell and secured the door at 10:15 p.m. (defendant Williamson's declaration page three, defendant Hardin's declaration page three, defendant Hynek's declaration page two, defendant Gore's declaration page two, and defendant Powell's declaration page two). Defendant Mourtada then left the cell and returned to his office to complete the injury assessment report (defendant Mourtada's declaration page two). Plaintiff never complained to defendant Mourtada that

9

he had been assaulted or that he was injured (defendant Mourtada's declaration page two). Defendant Gore did not see any use of force by any officers nor did he observe any injuries to plaintiff (defendant Gore's declaration page two). Plaintiff did not complain to defendant Gore that he was injured (defendant Gore's declaration page two). Plaintiff said little while the defendants were in the cell, but after they departed, he came to the window and started yelling "Put me in four-points" (defendant Hynek's declaration page three). Defendant Hynek advised plaintiff to remain quiet and to stay calm for the night (defendant Hynek's declaration page three). Plaintiff was not placed in restraints because staff did not feel that it was necessary at that time. During the incident, defendant Williamson sustained a scratch on his left ring finger which was noted and checked by the Physician Assistant (defendant Williamson's declaration page three and defendant Hynek's declaration page three). Defendant Hardin sustained no injuries (defendant Hynek's declaration page three).

On February 25, 1998, plaintiff was seen by health services staff following plaintiff's complaint of injuries related to the above mentioned forced cell move (Dr. Gene M. Roffers' declaration page two). Plaintiff complained at the time that he was thrown against the wall, striking his right jaw, and then when he was on the ground, custody staff put a knee on his jaw (Dr. Gene M. Roffers' declaration page two). Examination at this time revealed a well healed abrasion to the right cheek area and a popping of the right TMJ (temporo-mandibular joint) just in front of the ear. A consult was obtained by an oral surgeon who diagnosed possible internal derangement of the right TMJ. The oral surgeon recommended conservative treatment with non steroidal anti-inflammatory agents, heat, and a soft diet (Dr. Gene M. Roffers' declaration page two). Although plaintiff continues to complain of pain, he has subsequently been seen by dentists and oral surgeons who cannot find any clinical basis for the pain (Dr. Gene M. Roffers' declaration pages two and three).

10

No surgery has been recommended and an MRI is not currently indicated based on clinical findings (Dr. Gene M. Roffers' declaration page three). Plaintiff did have surgery to correct his chronically dislocating right shoulder on July 30, 1999 (Dr. Gene M. Roffers' declaration page three).

Standard procedure in effect when this incident occurred was for officers to verify that inmates are not enemies prior to placing them in a cell together. Standard procedure also included reviewing the other inmate's records because he had just arrived at FCI Talladega on February 23, 1998 (defendant Hynek's declaration page three). Defendant Hynek recalls defendant Williamson stating to her that he had checked the Special Unit Housing form and that there was no indication that plaintiff and the other inmate could not be housed together (defendant Hynek's declaration page three). Defendant Hynek certifies that the inmate who was placed in the cell with plaintiff on February 23, 1998, is not listed as a separatee on plaintiff's Special Housing Unit Form (defendant Hynek's declaration page three). A review of the pertinent inmate records reflects that prior to February 23, 1998, the two inmates were never housed at the same institution together (defendant Hynek's declaration page four).

The Captain, Staff Duty Officer, and Warden were first notified of the incident by telephone and then by a subsequent Report of Incident (defendant Hynek's declaration page three). The entire documentation of the incident was reviewed by the Warden, Health Services Administrator, Captain, and Associate Warden Custody during the After Action Review (defendant Hynek's declaration page three). An incident report was written regarding plaintiff's actions (defendant Hynek's declaration page three).

On February 24, 1998, at approximately 6:25 p.m., Officer Testerman delivered an incident report to plaintiff charging him with Minor Assault, Refusing an Order, and Refusing To Accept A

11

Program Assignment (Officer Testerman's declaration page two). During the initial investigation of the incident report, plaintiff elected to make a statement (Disciplinary Hearing Officer Bryan's declaration page one). Plaintiff stated that he and the other inmate had problems as holdovers at USP Atlanta, that he feared for his life and legal work, and that that was the reason he refused the other inmate as a cell mate (Disciplinary Hearing Officer Bryan's declaration page one). Plaintiff stated that he did refuse to have his handcuffs removed because he did not want to be in the cell with the other inmate (Disciplinary Hearing Officer Bryan's declaration page one). Plaintiff continued by stating that when the officer tried to move him to the food slot, he did jerk away from the officer (Disciplinary Hearing Officer Bryan's declaration page one). Plaintiff also stated that cutting a finger of the officer by jerking away from him is not classified as an assault and that he would beat this shot like all the ones before (Disciplinary Hearing Officer Bryan's declaration page one). During the hearing before the Unit Disciplinary Committee, plaintiff stated that he had not received a copy of the incident report (Disciplinary Hearing Officer Bryan's declaration page two). Ms. McIntyre stopped the hearing at that time and spoke to Acting Lieutenant Testerman who stated that plaintiff had been given a copy of the report (Disciplinary Hearing Officer Bryan's declaration page two). Plaintiff stated that he refused to take off the cuffs because they were going to leave him in the cell with the other inmate. Plaintiff stated further that he did pull away but that was when the officers attempted to remove the cuffs and leave him in the cell (Disciplinary Hearing Officer Bryan's declaration page two). The Unit Disciplinary Committee referred the matter to the Disciplinary Hearing Officer (hereinafter DHO) (Disciplinary Hearing Officer Bryan's declaration page two). Plaintiff was provided with the Notice of Discipline Hearing Before the DHO Form on February 26, 1998. At that time, plaintiff requested Randy Jones, Unit Manager, as his staff representative and he

12

requested witnesses (Disciplinary Hearing Officer Bryan's declaration page two). On this same date, plaintiff was also provided and signed for the Inmate Rights at a Discipline Hearing Form.

On March 6, 1998, the DHO hearing was held before Officer Bryan. The DHO report reflects that plaintiff demanded his staff representative be fired or removed and that his case be continued (Disciplinary Hearing Officer Bryan's declaration page two and Attachment 1). Plaintiff believed there was a conflict of interest because Mr. Jones knew the other inmate. Plaintiff stated that he needed documentation from his personal property to show that he had received injuries as a result of the officers taking him to the floor and Officer Bryan indicated that he was aware that plaintiff alleged he received injuries as a result of being taken to the floor and denied his request because it was not relevant to the hearing   (Disciplinary Hearing Officer Bryan's declaration page two and Attachment 1). Plaintiff then demanded that Lieutenant McManus be his staff representative. Officer Bryan explained to plaintiff that Lieutenant McManus had been on extended sick leave for three months and was not expected to return any time soon. Plaintiff stated that if he could not have Lieutenant McManus, he did not want anyone and refused to participate in the hearing because his rights were being violated (Disciplinary Hearing Officer Bryan's declaration page two and Attachment 1). Officer Bryan allowed plaintiff to leave the room and considered his departure from the room to be a waiver of appearance. The waiver was filled out by S. Roberts and witnessed by Mr. Jones (Disciplinary Hearing Officer Bryan's declaration page two and Attachment 1). Plaintiff did not request to call any witnesses in regards to this incident (Disciplinary Hearing Officer Bryan's declaration page two and Attachment 1). Officer Bryan had a discussion with the other inmate who indicated that he had no problems being in the cell with plaintiff and that did not remember plaintiff from the past (Disciplinary Hearing Officer Bryan's declaration page two and Attachment 1). Having

13

considered all of the evidence, Officer Bryan determined that plaintiff committed the prohibited act

as charged (Disciplinary Hearing Officer Bryan's declaration page two and Attachment 1).

## DISCUSSION

### FICTITIOUS PARTIES

In his complaint, plaintiff named as defendants "John Doe #1, #2 and #3, Officers". It is well

established that the fictitious party practice is unavailable under the Federal Rules of Civil Procedure.

There is no provision in the federal statutes or the Federal Rules of Civil Procedure for the use of

fictitious parties. *See Lubin v. Sybedon Corporation*, 688 F.Supp. 1425 (S.D. Cal. 1988); *Weeks v.

Benton*, 649 F.Supp. 1297 (S.D. Ala. 1986).

### OFFICIAL CAPACITIES

The defendants maintain that plaintiff's claims against them in their official capacity as

employees of the federal government are deemed to be actions against the government and as such

are due to be dismissed.  It is well settled that the United States may not be sued without its consent

and that consent is a prerequisite for jurisdiction.  *United States v. Mitchell*, 463 U.S. 206, 212, 103

S.Ct. 2961, 77 L.Ed.2d 580 (1983); *United States v. Dalm*, 494 U.S. 596, 608, 110 S.Ct. 1361, 108

L.Ed.2d 548 (1990).  "[A] suit is considered to be against the sovereign if 'the judgment sought

would expend itself on the public treasury or domain.'"  *Clark v. United States,* 691 F.2d 837, 839

(7th Cir. 1987) (quoting *Land v. Dollar*, 330 U.S. 731, 738, 67 S.Ct. 1009, 91 L.Ed. 1209 (1947)).

Federal courts have no jurisdiction to consider monetary claims against the United States absent an

unequivocal expressed waiver.  *United States v. Testan*, 424 U.S. 392, 399, 96 S.Ct. 948, 47 L.Ed.2d

114 (1976); *United States v. King*, 395 U.S. 1, 4, 89 S.Ct. 1501, 23 L.Ed.2d 52 (1969).  The Federal

14

Tort Claims Act (FTCA) provides a remedy for a "negligent or wrongful act or omission," by an officer or employee of the federal government acting within the scope of his employment. *28 U.S.C. § 2680(h).* Thus, broadly speaking the FTCA provides a limited waiver of sovereign immunity for negligent actions, but not for certain intentional torts, which if they violated a constitutional right could be actionable under *Bivens*. Under the FTCA, the only proper defendant is the United States of America. 28 U.S.C. § 2679(b)(1) and (d)(1). Therefore, the individual defendants in their official capacities are due to be dismissed.

FAILURE TO PROTECT

Plaintiff claims that on February 23, 1998, defendants Williamson and Hardin, at the direction of defendant Hynek, placed another inmate in his cell after plaintiff had explained to them that he had previously had a verbal altercation with the other inmate while the two inmates were at USP Atlanta. The other inmate was to be plaintiff's cell mate. Plaintiff claims that he was in fear for his life. Defendant Hynek states in her sworn and undisputed declaration that standard procedure in effect at the time was for officers to verify that inmates are not enemies prior to placing them in a cell together (defendant Hynek's declaration page three). It is further undisputed that standard procedure also included reviewing the other inmate's records because he had just arrived at FCI Talladega on February 23, 1998 (defendant Hynek's declaration page three). Defendant Hynek states further in her sworn and undisputed declaration that she recalls defendant Williamson stating to her that he had checked the Special Unit Housing form and that there was no indication that plaintiff and the other inmate could not be housed together (defendant Hynek's declaration page three). Further, defendant Hynek certifies that the inmate placed in the plaintiff's cell on February 23, 1998, is not listed as a separatee on plaintiff's Special Housing Unit form (defendant Hynek's declaration page

15

three). A redacted copy of plaintiff's Special Housing Unit Record is attached to defendant Hynek's declaration marked Attachment 5. In addition, a subsequent review of the pertinent inmate records reflects that prior to February 23, 1998, the two inmates were never housed at the same institution together. Those records are attached to defendant Hynek's sworn and undisputed declaration marked Attachment 3 and Attachment 4.

The law is now well established that prisoners have a right to be protected from the constant threat of violence by other inmates and that a failure by prison officials to control and separate prisoners who endanger the physical safety of others may amount to cruel and unusual punishment of any inmates so harmed by fellow inmates. *See Gullatte v. Potts*, 654 F.2d 1007 (5th Cir. 1981); *Hopkins v. Britton*, 742 F.2d 1308 (11th Cir. 1984). However, prison officials are not the insurers of the safety of inmates. *Jones v. United States*, 534 F.2d 53 (5th Cir.), *cert. denied*, 429 U.S. 978 (1976). "When officials are aware of a danger to an inmate's health and safety . . . it does violate the constitutional proscription against cruel and unusual punishment to fail to afford that inmate reasonable protection." *Gullatte v. Potts, supra*, at 1012. Not every isolated incident of violence by one inmate toward another rises to the level of a constitutional violation. To establish a deprivation of Eighth Amendment rights, a prisoner must show deliberate indifference on the part of the prison officials to the prisoner's need for reasonable protection from violence. *Williams v. Bennett*, 689 F.2d 1370, 1380 (11th Cir. 1982), *cert. denied*, 464 U.S. 932 (1983). Thus, the law requires only that prison officials who are aware or who should be aware of a threat to an inmate must act reasonably to provide that inmate protection from the danger.

Defendants Williamson, Hardin, and Hynek, as prison guards, are not the insurers of the plaintiff's safety. Here, the plaintiff does not allege any facts which could form a basis for a finding

16

that defendants Williamson, Hardin, and Hynek could have anticipated an attack on plaintiff but were deliberately indifferent to his need for protection. It is undisputed that standard procedure at the time dictated that officers verify that the two inmates were not enemies prior to placing them in a cell together. It is undisputed that standard procedure dictated a review of the other inmate's records because he had just arrived at FCI Talladega on February 23, 1998. It is also undisputed that the inmate who was placed into the cell with plaintiff on February 23, 1998, was not listed as a separatee on plaintiff's Special Housing Unit form and that the Special Housing Unit form was checked prior to the other inmate being placed into the cell with plaintiff. It is further undisputed that a subsequent review of the pertinent inmate records reflects that prior to February 23, 1998, the two inmates were never housed at the same institution together. Clearly, plaintiff has failed to show deliberate indifference on the part of defendants Williamson, Hardin, and Hynek to his need for reasonable protection from violence. The defendants are entitled to summary judgment on this claim.

Likewise, plaintiff has not stated a due process claim against defendants Williamson, Hardin, and Hynek. Insofar as plaintiff alleges that defendants Williamson, Hardin, and Hynek negligently placed him in the cell with the other inmate, the defendants are entitled to summary judgment on this claim. The Supreme Court held in *Daniels v. Williams*, 474 U.S. 327 (1986) and *Davidson v. Cannon*, 474 U.S. 344 (1986), "the due process clause of the Fourteenth Amendment is not implicated by lack of due care of an official causing unintended injury to life, liberty, or property. In other words, where a government official is merely negligent in causing the injury, no procedure for compensation is constitutionally required." 474 U.S. at 347.

17

EXCESSIVE FORCE

Plaintiff claims that defendants Williamson and Hardin used excessive force upon him when he refused to allow them to remove his handcuffs and requested permission to speak with defendant Hynek about being placed in a cell with an inmate whom he feared. He claims further that defendants Hardin, Williamson, Gore, and Powell and an unknown officer used excessive force upon him when they moved him from cell C-6 to cell A-2. The Eighth Amendment prohibition against cruel and unusual punishment is triggered when a prisoner is subjected to an "unnecessary and wanton infliction of pain." *Whitley v. Albers*, 475 U.S. 312, 319 (1986). The Supreme Court held in *Hudson v. McMillian*, 112 S. Ct. 995 (1992), that "whenever prison officials stand accused of using excessive physical force in violation of the Cruel and Unusual Punishments Clause, the core judicial inquiry [in determining whether a prisoner has suffered unnecessary and wanton pain] is that set out in *Whitley*: whether force was applied in a good-faith effort to maintain or restore discipline, or maliciously and sadistically to cause harm." 112 S. Ct. at 999. In extending *Whitley* to all cases involving allegations of force, the Court reasoned:

> Many of the concerns underlying our holding in *Whitley* arise whenever guards use force to keep order. Whether the prison disturbance is a riot or a lesser disruption, corrections officers must balance the need "to maintain or restore discipline" through force against the risk of injury to inmates. Both situations may require prison officials to act quickly and decisively. Likewise, both implicate the principle that " `[p]rison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security.' "

*Id*. at 998-9 (citations omitted). With these concerns in mind, the Court set out certain factors that should be considered in evaluating whether the use of force was wanton and unnecessary. They include: 1) the need for the application of force; 2) the relationship between the need and the amount

of force used; 3) the threat reasonably perceived by the prison official; 4) any efforts made to temper the severity of a forceful response; and 5) the extent of the injury suffered by the inmate. The *Hudson* Court made it clear that the extent of injury suffered by the inmate is only one of the many factors which should be considered, not a decisive one when it said, "[t]he absence of serious injury is therefore relevant to the Eighth Amendment inquiry, but does not end it." *Id*. at 999.

After a careful review of the complaint filed by plaintiff and the special report filed by the defendants, it is the opinion of the court that there is no <u>genuine</u> issue of material facts in dispute regarding the force that was used to subdue plaintiff or to move plaintiff to another cell. In determining what facts are undisputed, the court must begin with those specifically and expressly stated by the plaintiff. But, the process does not end there. In addition to the facts stated by the non-moving plaintiff, the court must also take into account those facts stated by the defendants which are not disputed by the plaintiff. Facts submitted by a defendant and not expressly disputed by the plaintiff cannot be ignored in the summary judgment calculus because they too exist as "undisputed" facts. As the Supreme Court explained in *Celotex*, the ultimate burden is on the plaintiff to come forward with evidence supporting each element of his claim. Because the burden of proof in the lawsuit is on the plaintiff, he may not merely rest upon conclusory or vague pleadings, but must affirmatively rebut evidentiary matters offered by the defendant which, if left undisputed, show that the plaintiff is not entitled to recover in the action.

The court notes that in his complaint, plaintiff admits that he resisted defendants Williamson and Hardin's efforts to remove his handcuffs and that he pulled away from the cell door. Plaintiff states further that defendants Williamson and Hardin grabbed him, threw him against the wall on his jaw, twisted his right arm upward, and then threw him onto the floor. He also claims that defendants

Williamson and Hardin then put their feet on his face. Defendants Williamson and Hardin state in their sworn and undisputed declarations that plaintiff became irate when they placed the other inmate into the cell with him and that he stated that he did not want a cell mate. Defendants Williamson and Hardin state that after the cell door was secured and the other inmate's handcuffs were removed, plaintiff was ordered to come to the cell door so that his handcuffs could be removed, but plaintiff refused to comply with the order stating that he was keeping the handcuffs. Defendants Williamson and Hardin state further in their sworn and undisputed declarations that the other inmate was re-cuffed so that the cell door could be opened and plaintiff could be moved to cell A-2. Defendants Williamson and Hardin state that they secured plaintiff with defendant Williamson holding the handcuffs with his left hand while defendant Hardin stood at plaintiff's side guiding him as they backed out of the cell. Defendants Williamson and Hardin state that when plaintiff reached the toilet area, he stopped moving then twisted his body in an attempt to jerk away from defendant Williamson. Defendant Williamson states that his left ring finger became caught between the cuffs causing him excruciating pain and that plaintiff continued twisting and trying to jerk free preventing defendant Williamson from being able to free his finger. Defendant Hardin states that he observed defendant Williamson struggle because his finger was caught in the handcuffs. Defendants Williamson and Hardin state that defendant Hardin then grabbed plaintiff by his right arm and pushed him toward a mattress on the floor with his right hand on plaintiff's shoulder. Defendant Williamson states that he was then able to release the cuffs. Defendants Williamson and Hardin state that defendant Hardin pinned plaintiff to the mattress with both hands on his shoulders while defendant Williamson called for assistance. Defendant Hardin states that he instructed plaintiff to remain still and calm. Defendant Hardin states further in his sworn and undisputed declaration that

20

he used the minimum force necessary to restore order and to protect defendant Williamson from further injury from plaintiff. Defendants Williamson and Hardin state that while they waited for defendant Hynek to arrive, defendant Hardin kept plaintiff pinned to the mattress.

The court notes that although plaintiff filed a Request for Extension of Time within which to respond to the defendants' Special Report in which he stated that he was currently researching facts and law so that he could properly file a reply to the defendants' Special Report, plaintiff failed to respond to the defendants' Special Report. It is noted that although the court entered an Order notifying plaintiff that the court would construe the defendants' Special Report as a motion for summary judgment and giving plaintiff the opportunity to respond to the motion for summary judgment prior to the motion being taken under advisement, plaintiff still failed to respond to the motion for summary judgment.

Applying the factors set forth in *Whitley* to the facts of this case, it is clear that there was a need for the application of force. It is undisputed that plaintiff failed to comply with defendants Williamson and Hardin's order that he come to the cell door so that his handcuffs could be removed. It is undisputed that not only did plaintiff resist defendants Williamson and Hardin's efforts to remove the handcuffs and pull away from the cell door, he also twisted his body in an attempt to jerk free from defendant Williamson and, in doing so, defendant Williamson's finger became caught in the handcuffs causing defendant Williamson excruciating pain. It is undisputed that defendant Hardin immediately grabbed plaintiff by the right arm and pushed him down to the mattress on the floor with his right hand on plaintiff's shoulder. It is also undisputed that defendant Hardin pinned plaintiff to the mattress with both hands on his shoulders and remained that way until defendant Hynek arrived. Plaintiff failed to expressly dispute these facts as set forth by the defendants in their

21

Mourtada examined plaintiff, he asked him if he had any injuries and plaintiff replied in the negative. It is undisputed that defendant Mourtada also asked plaintiff if he needed any medication and plaintiff responded "No" and that he was "Fine". It is further undisputed that defendant Mourtada performed a visual and manual check on plaintiff and noted no injuries. According to the Inmate Injury Assessment and Followup report completed by defendant Mourtada immediately following the use of force, plaintiff was not in distress and there was no evidence of injury present at the time of the examination. The injury assessment reveals that plaintiff required no medical attention. Under these circumstances, the court has no difficulty concluding that the undisputed evidence fails to show that defendants Williamson and Hardin acted maliciously and sadistically but, on the contrary, acted in good faith to restore order. Defendants Williamson and Hardin are entitled to summary judgment with respect to plaintiff's claim that they used excessive force upon him.

Defendants Hardin, Williamson, Gore, and Powell are also entitled to summary judgment with respect to plaintiff's claim that they used excessive force upon him when they moved him from cell C-6 to a new cell. Plaintiff failed to expressly dispute defendants Williamson, Hardin, Hynek, Gore, and Powell's sworn declarations that he was escorted to cell A-2 by defendants Gore, Powell, and Hardin without incident. Plaintiff failed to expressly dispute defendants Williamson, Hardin and Hynek's sworn declaration that he was seated on a mattress inside the new cell. Plaintiff does not dispute the defendants' assertions that after defendant Mourtada examined plaintiff and stated that he had no injuries, the defendants exited the cell and secured the door at 10:15 p.m. As previously noted, facts submitted by a defendant and not expressly disputed by the plaintiff cannot be ignored in the summary judgment calculus because they too exist as "undisputed" facts. As the Supreme Court explained in *Celotex*, the ultimate burden is on the plaintiff to come forward with evidence

23

supporting each element of his claim. Because the burden of proof in the lawsuit is on the plaintiff, he may not merely rest upon conclusory or vague pleadings, but must affirmatively rebut evidentiary matters offered by the defendant which, if left undisputed, show that the plaintiff is not entitled to recover in the action. In accord with the undisputed facts, it is clear that defendants Hardin, Williamson, Gore, and Powell did not use excessive force upon plaintiff when they moved him from cell C-6 to cell A-2.

<u>VERBAL ABUSE</u>

Plaintiff next claims that upon her arrival at his cell, defendant Hynek spoke to him in racially offensive terms. It is well established that verbal harassment or abuse does not state a constitutional violation. *Collins v. Cundy*, 603 F.2d 825 (10th Cir. 1979). Words, threats and harassment are simply not actionable as violations of the Constitution. *Jones v. Superintendent*, 370 F.Supp. 488, 491 (W.D.Va. 1974), *citing Johnson v. Glick*, 481 F.2d 1028 (2d Cir. 1973), *cert. denied*, 414 U.S. 1033 (1973). *See also Stacey v. Ford*, 554 F.Supp. 8 (N.D.Ga. 1982). Defendant Hynek is entitled to summary judgment with respect to this claim.

<u>DENIAL OF ADEQUATE MEDICAL ATTENTION</u>

Plaintiff's next claim is that defendant Mourtada denied him proper medical attention following the use of force. In order to establish liability under § 1983 for inadequate medical treatment, a prisoner  must show that a failure to provide medical treatment amounted to cruel and unusual treatment in violation of the Eighth Amendment. The United States Supreme Court has held that it is only "deliberate indifference to serious medical needs of prisoners which will give rise to a claim of cruel and unusual punishment in violation of the Eighth Amendment." *Estelle v. Gamble*, 429 U.S. 97 (1976). "Medical treatment violates the Eighth Amendment only when it is 'so grossly

incompetent, inadequate, or excessive as to shock the conscience or to be intolerable to fundamental fairness.'" *Harris v. Thigpen,* 941 F.2d 1495, 1505 (11th Cir. 1991), quoting *Rogers v. Evans,* 792 F.2d 1052, 1058 (11th Cir. 1986). The conduct of prison officials must run counter to evolving standards of decency or involve the unnecessary and wanton infliction of pain to be actionable under § 1983. *Bass v. Sullivan,* 550 F.2d 229 (5th Cir.), *cert. denied,* 434 U.S. 864 (1977). Mere negligence is insufficient to support a constitutional claim. *Fielder v. Bosshard,* 590 F.2d 105 (5th Cir. 1979). As stated by the *Estelle* Court, "medical malpractice does not become a constitutional violation merely because the victim is a prisoner." 429 U.S. at 106. Therefore, an accidental or inadvertent failure to provide medical care or negligent diagnosis or treatment of a medical condition does not constitute a wrong under the Eighth Amendment. *See Ramos v. Lamm,* 639 F.2d 559 (10th Cir. 1980), *cert. denied,* 450 U.S. 1041 (1981). Neither will a mere difference of an opinion between an inmate and the institution's medical staff, as to treatment and diagnosis, alone give rise to a cause of action under the Eighth Amendment. *Smart v. Villar,* 547 F.2d 112 (10th Cir. 1976); *see also Estelle v. Gamble,* 429 U.S. at 106-08.

In *Hamm v. DeKalb County,* 774 F.2d 1567 (11th Cir. 1985), *cert. denied,* 475 U.S. 1096, 106 S. Ct. 1492, 89 L. Ed. 2d 894 (1986), the Eleventh Circuit held that an inmate's dissatisfaction with the medical treatment provided by the prison did not constitute a violation of the Eighth Amendment as long as the treatment provided did not amount to deliberate indifference. The Eighth Amendment is implicated only when the prison doctors or guards intentionally and deliberately deny or delay access to medical attention to serious medical conditions. *Barfield v. Brierton,* 883 F.2d 923, 938 (11th Cir. 1989). Two components must be evaluated to determine whether the plaintiff has been subjected to cruel and unusual punishment. "First, [the court] must evaluate whether there was

25

evidence of a serious medical need; if so, [it] must consider whether [the defendants'] response to that need amounted to deliberate indifference." *Mandel v. Doe,* 888 F.2d 783, 788 (11th Cir. 1989).

Plaintiff claims that following the use of force on February 23, 1998, defendant Mourtada came to his cell and examined him. He claims that defendant Mourtada merely told him to put some water on his face even though he was suffering from a dislocated shoulder and an injured jaw. Defendants Mourtada and Powell state in their sworn and undisputed declarations that after defendant Mourtada had examined plaintiff, he asked him if he had any injuries and plaintiff replied in the negative. Defendant Mourtada states further that he also asked plaintiff if he needed any medication and plaintiff responded "No" and that he was "Fine". Defendant Mourtada states that he performed a visual and manual check on plaintiff and noted no injuries. Defendant Mourtada states further in his sworn and undisputed affidavit that he then left the cell and returned to his office to complete the injury assessment report. He states that plaintiff never complained to him that he had been assaulted or that he was injured. Defendant Gore states in his sworn and undisputed declaration that he did not observe any injuries to plaintiff. Defendant Gore states that plaintiff did not complain to him that he was injured. Further, Dr. Gene M. Roffers, the Clinical Consultant to the Medical Director, has submitted a sworn declaration in which he states that he has conducted a thorough review of plaintiff's medical records. Dr. Roffers states that on February 25, 1998, two days after the use of force, plaintiff was seen by health services staff complaining of injuries related to the above mentioned forced cell move. Dr. Roffers states in his sworn and undisputed declaration that an examination revealed a well healed abrasion to plaintiff's right cheek area and a popping of the right TMJ (temporo-mandibular joint) just in front of the ear. Dr. Roffers states that in his opinion, either of these injuries may not have been readily apparent during the initial exam immediately

26

following the February 23, 1998 incident. Dr. Roffers states further that although plaintiff continues to complain of pain, he has subsequently been seen by dentists and oral surgeons who cannot find any clinical basis for this pain. He states that no surgery has been recommended and an MRI is not currently indicated based on clinical findings. Dr. Roffers states further that there is history of a torn ligament in plaintiff's right shoulder. He states that the injury is documented on an intake history form completed on May 30, 1997. Dr. Roffers also states that plaintiff did have surgery to correct his chronically dislocating right shoulder on July 30, 1999.

Although given the opportunity to (see Document # 35), plaintiff has failed to dispute any of the assertions made by defendants Mourtada, Powell, and Gore and Dr. Roffers. As previously noted, facts submitted by a defendant and not expressly disputed by the plaintiff cannot be ignored in the summary judgment calculus because they too exist as "undisputed" facts. It is noted that although plaintiff could have responded by stating that he did in fact tell defendant Mourtada that he needed medical attention or that it was obvious that he needed medical attention, plaintiff failed to respond to the facts asserted by the defendants and Dr. Roffers. Based upon the evidence presented, even if plaintiff had a serious medical need, it cannot be said that defendant Mourtada response to that need amounted to deliberate indifference. Especially in light of Dr. Roffers' undisputed statement that in his opinion, either of the injuries complained of by plaintiff may not have been readily apparent during the initial exam immediately following the February 23, 1998 incident. Based upon the undisputed facts, it appears that defendant Mourtada was not even aware that plaintiff needed medical treatment. Plaintiff does not allege that he informed defendant Mourtada that he needed medical attention nor does he allege that it was obvious that he needed medical attention. Defendant Mourtada is entitled to summary judgment on this claim.

## VIOLATION OF BUREAU OF PRISON PROGRAM STATEMENT

Plaintiff claims that the defendants violated Bureau of Prison Program Statement 5566.05, subparagraphs 5(1) and (2) by using force against a handcuffed inmate in a cell and not having a camera for documentation. The mere fact that agency regulations have been violated does not by itself raise a constitutional issue. *United States v. Caceres*, 440 U.S. 741 (1979); *Caruth v. Pinkney*, 683 F.2d 1044 (7th Cir. 1982), *cert. denied*, 459 U.S. 1214 (1983); *Dowdy v. Johnson*, 510 F.Supp. 836, 838 (E.D. Va. 1981). The defendants are entitled to summary judgment on this claim.

## DENIAL OF DUE PROCESS

Plaintiff next claims that he was denied due process in connection with disciplinary charges brought against him in connection with the incident. He claims that he was falsely charged with assault even though his hands were cuffed during the incident and that his right to confront his accusers was violated when the disciplinary hearing officer held his disciplinary hearing without him being present.

On February 24, 1998, at approximately 6:25 p.m., Officer Testerman delivered an incident report to plaintiff charging him with Minor Assault, Refusing an Order, and Refusing To Accept A Program Assignment in connection with the February 23, 1998 incident. During the initial investigation of the incident report, plaintiff elected to make a statement. Plaintiff stated that he and the other inmate had problems as holdovers at USP Atlanta, that he feared for his life and legal work, and that that was the reason he refused the other inmate as a cell mate. Plaintiff stated that he did refuse to have his handcuffs removed because he did not want to be in the cell with the other inmate. Plaintiff continued by stating that when the officer tried to move him to the food slot, he did jerk away from the officer. Plaintiff also stated that cutting a finger of the officer by jerking away from

him is not classified as an assault and that he would beat this shot like all the ones before. During

the hearing before the Unit Disciplinary Committee, plaintiff stated that he had not received a copy

of the incident report. Ms. McIntyre stopped the hearing at that time and spoke to Acting Lieutenant

Testerman who stated that plaintiff had been given a copy of the report. Plaintiff stated that he

refused to take off the cuffs because they were going to leave him in the cell with the other inmate.

Plaintiff stated further that he did pull away but that was when the officers attempted to remove the

cuffs and leave him in the cell. The Unit Disciplinary Committee referred the matter to the

Disciplinary Hearing Officer (hereinafter DHO). Plaintiff was provided with the Notice of Discipline

Hearing Before the DHO Form on February 26, 1998. At that time, plaintiff requested Randy Jones,

Unit Manager, as his staff representative and he requested witnesses. On this same date, plaintiff was

also provided and signed for the Inmate Rights at a Discipline Hearing Form.

On March 6, 1998, the DHO hearing was held before Officer Bryan. The DHO report reflects

that plaintiff demanded his staff representative be fired or removed and that his case be continued.

Plaintiff believed there was a conflict of interest because Mr. Jones knew the other inmate. Plaintiff

stated that he needed documentation from his personal property to show that he had received injuries

as a result of the officers taking him to the floor and Officer Bryan indicated that he was aware that

plaintiff alleged he received injuries as a result of being taken to the floor and denied his request

because it was not relevant to the hearing. Plaintiff then demanded that Lieutenant McManus be his

staff representative. Officer Bryan explained to plaintiff that Lieutenant McManus had been on

extended sick leave for three months and was not expected to return any time soon. Plaintiff stated

that if he could not have Lieutenant McManus, he did not want anyone and refused to participate in

the hearing because his rights were being violated. Officer Bryan allowed plaintiff to leave the room

and considered his departure from the room to be a waiver of appearance. The waiver was filled out by S. Roberts and witnessed by Mr. Jones. Plaintiff did not request to call any witnesses in regards to this incident during the hearing. Officer Bryan had a discussion with the other inmate who indicated that he had no problems being in the cell with plaintiff and that he did not remember plaintiff from the past. Having considered all of the evidence, Officer Bryan determined that plaintiff committed the prohibited act as charged. Plaintiff was sentenced to the disallowance of good conduct time of 53 days, loss of commissary privileges for 90 days, and disciplinary segregation for three days.

In *Wolff v. McDonnell*, 418 U.S. 539 (1974), the Supreme Court set forth the following minimum due process requirements to be accorded prisoners facing disciplinary proceedings that could result in the loss of good time credits or in disciplinary segregation: (1) "written notice of the charges must be given" to the inmate at least 24-hours in advance of the proceeding; (2) the inmate "should be allowed to call witnesses and present documentary evidence in his defense, when permitting him to do so will not be unduly hazardous to institutional safety or correctional goals"; and (3) the inmate must be given "a 'written statement by the factfinders as to the evidence relied on and reasons' for the disciplinary action." *Wolff*, 418 U.S. at 564-66.

It is clear that these requirements were met in this case. It is undisputed that the plaintiff was given advance notice of the charges. On February 24, 1998, at approximately 6:25 p.m., Officer Testerman delivered an incident report to plaintiff charging him with Minor Assault, Refusing an Order, and Refusing To Accept A Program Assignment in connection with the February 23, 1998 incident. On February 26, 1998, following the initial investigation, plaintiff was provided with the Notice of Discipline Hearing Before the Disciplinary Hearing Officer Form. The disciplinary hearing

30

was held before Officer Bryan on March 8, 1998.   It is further undisputed that plaintiff was

permitted to testify and to call witnesses at the hearing. It is undisputed that on February 26, 1998,

when plaintiff was provided with the Notice of Discipline Hearing Before the DHO Form, he

requested Randy Jones, Unit Manager, as his staff representative and he requested witnesses. It is

undisputed that on March 8, 1998, during the hearing, plaintiff demanded that Mr. Jones be

dismissed as his staff representative because he believed there to be a conflict of interest and

demanded that Lieutenant McManus, who had been on extended sick leave for three months and was

not expected to return any time soon, be his staff representative.  It is undisputed that plaintiff stated

that if he could not have Lieutenant McManus, he did not want anyone and then he refused to

participate in the hearing alleging that his rights were being violated. It is undisputed that Officer

Bryan allowed plaintiff to leave the room and considered his departure from the room to be a waiver

of appearance. The waiver was filled out by S. Roberts and witnessed by Mr. Jones. It is undisputed

that plaintiff did not request to call any witnesses in regards to this incident during the disciplinary

hearing.  It is also undisputed that plaintiff was provided a complete copy of the DHO report with

written notification of his appeal rights.

    The standard of proof required for a finding of guilt in prison disciplinary proceedings "is

necessarily lower than that demanded in criminal parole-probation revocation, or civil proceedings."

*Smith v. Rabalais*, 659 F.2d at 546.   "[T]he requirements of due process are satisfied if some

evidence supports the decision by the prison disciplinary board." *Superintendent v. Hill*, 472 U.S.

445, 455 (1985).

> Th[e "some evidence"] standard is met if "there was some evidence from which the
> conclusion of the administrative tribunal could be deduced . . . ."  Ascertaining
> whether this standard is satisfied does not require examination of the entire record,

31

independent assessment of the credibility of witnesses, or weighing of the evidence. Instead, *the relevant question is whether there is any evidence in the record that could support the conclusion reached by the disciplinary board.* . . . Prison disciplinary proceedings take place in a highly charged atmosphere, and prison administrators must often act swiftly on the basis of evidence that might be insufficient in less exigent circumstances. The fundamental fairness guaranteed by the Due Process Clause does not require courts to set aside decisions of prison administrators that have some basis in fact.

*Id.* at 455-56 (citations omitted) (emphasis added).

The disciplinary hearing officer based his finding on the following facts: (1) Officers Williamson and Hardin handcuffed inmate Tillman to place another inmate in his cell, (2) Inmate Tillman stated that he did not want a cellmate, claiming to have had problems with this inmate in the past, (3) Inmate Tillman was ordered to have his handcuffs removed, (4) Inmate Tillman refused to obey the orders, (5) As the two Officers attempted to remove Inmate Tillman from the cell he twisted his body, causing injury to the Officer, (6) Inmate Tillman stated that he did refuse to have the other inmate, (7) Inmate Tillman stated that he did refuse to give up the handcuffs, and (8) Inmate Tillman stated that he did attempt to jerk away from the officers. This is clearly "some evidence" supporting the hearing officer's finding that the plaintiff committed minor assault, refused an order, and refused to accept a program assignment.  It is clear that the hearing officer relied on the testimony of plaintiff,  statements made by the inmate whom the defendants sought to place in the cell with plaintiff, the incident report and investigation, a memorandum dated 2/23/98 from defendant Hardin, and a memorandum dated 2/23/98 from defendant Williamson when making his finding. The defendants are entitled to summary judgment with respect to this claim.

32

CONSPIRACY

Plaintiff's final claim is that the defendants conspired to obstruct the investigation. Plaintiff has failed to state any facts to support his allegations of conspiracy. "In conspiracy cases, a defendant must be informed of the nature of the conspiracy which is alleged. It is not enough to simply aver in the complaint that a conspiracy existed." *Fullman v. Graddick*, 739 F.2d 553, 557 (11th Cir. 1984). A complaint may justifiably be dismissed because of the conclusory, vague and general nature of the allegations of conspiracy. *Fullman v. Graddick*, *supra*. Accordingly, the defendants are entitled to summary judgment with respect to the plaintiff's claims of conspiracy.

The Court EXPRESSLY FINDS that there are no genuine issues of material fact and that defendants J. L. Sivley, Lora Hynek, Howard Williamson, Reese Hardin, Paul Gore, Jeffrey Powell, and Mounir Mourtada are entitled to judgment as a matter of law. Accordingly, for the reasons stated above, defendants J. L. Sivley, Lora Hynek, Howard Williamson, Reese Hardin, Paul Gore, Jeffrey Powell, and Mounir Mourtada's motion for summary judgment is due to be GRANTED and this action against defendants J. L. Sivley, Lora Hynek, Howard Williamson, Reese Hardin, Paul Gore, Jeffrey Powell, and Mounir Mourtada DISMISSED WITH PREJUDICE.

A separate final judgment consistent with this Memorandum of Opinion will be entered contemporaneously herewith.

DATED this 3rd day of June, 2003.

ROBERT B. PROPST
UNITED STATES DISTRICT JUDGE

33

United States Court of Appeals
Eleventh Circuit
56 Forsyth Street, N.W.
Atlanta, Georgia 30303

Thomas K. Kahn                                                    In Replying Give Number
Clerk                                                            Of Case and Names of Parties

# NOTICE TO PRISONERS CONCERNING CIVIL APPEALS

---

The Prison Litigation Reform Act of 1995 (effective April 26, 1996) now **REQUIRES** that all prisoners pay the Court's $100 docket fee plus $5 filing fee (for a total of $105) when appealing any civil judgment.

If you wish to appeal in a civil case that Act now **requires** that upon filing a notice of appeal you *either*:

(1)   Pay the total $105 fee to the clerk of the district court from which this case arose; *or*

(2)   arrange to have a prison official certify to the district court from which the appeal arose the average monthly deposits and balances in your prison account for each of the six months preceding the filing of a notice of appeal.

If you proceed with option (2) above, the Act requires that the district court order you to pay an *initial partial fee* of at least 20% of the **greater** of either the average monthly deposits or of the average monthly balances shown in your prison account. The remainder of the total $105 fee will thereafter be deducted from your prison account each month that your account balance exceeds $10.00. Each such monthly deduction shall equal 20% of all deposits to your prison account during the previous month, until the total $105 fee is paid. (If your prison account statement shows that you cannot pay even the required *initial partial fee*, your appeal may nevertheless proceed, BUT THE TOTAL $105 FEE WILL BE ASSESSED AGAINST AND WILL BE DEDUCTED FROM FUTURE DEPOSITS TO YOUR PRISON ACCOUNT.)

Fees are not refundable, regardless of outcome, and deductions from your prison account will continue until the total $105 fee is collected, even if an appeal is unsuccessful.


THOMAS K. KAHN
Clerk


PLRA Notice